Good morning, Your Honors. May it please the Court, Jason Carr appearing on behalf of Appellant Cirino. Cirino's issue on appeal concerns a reconciliation, a post-Booker inquiry into how 3553A factors work, specifically in the context of a career offender's sentence. Unfortunately, it appears that the question presented by Cirino may exceed the permissible scope of appeal based on this Court's decision in the United States v. Combs. I'd be forced to concede that Combs does appear to be determinative of the question of what issues may be appealed after a limited amyloid remand is or after a limited amyloid remand. You should know, Counsel, that that case is not yet final. They've now just granted an extension for filing of a PFR. So the game is not over. Well, that's a positive development, to be sure. And I would submit in this case that if Combs does become enshrined as President from this Court, that there are some factors that take my situation here, or Cirino's situation, out of the pretty limited factual holding that Combs talks about, because Combs does say that it is limited to the specific procedural context of that case. In my situation, I would submit that the District Court, in inquiring whether or not it would have imposed a materially different sentence under an advisory guideline regime, did have more of a, he ordered a full resentencing. Cirino was not a full resentencing, excuse me, but he had something akin to a full resentencing, where Cirino was there, he entertained written and oral arguments. In a sense, he demonstrated the answer by imposing the same sentence all over again. I mean, he writes sort of a hybrid proceeding. He doesn't simply answer the limited amyloid remand question. He went and had what looked more like a resentencing and wound up with exactly the same sentence. So we can take that as the answer no to the amyloid limited remand question. We can take it as a new sentence. Either way, it comes out to the same result. I take it your challenge at that point is that result is unreasonable. Assuming Combs doesn't apply for the moment, that result is unreasonable in the post-Booker world for some reason. The nucleus of our argument, the crux of it would be that in a career offender context, at least under the specific facts of this case, that the 35, there's an inherent tension between 3553A factors. There's a factor that the Court must consider the guideline range. In this case, the guideline range. What makes the sentence unreasonable? I mean, to be blunt about it, your client's record is pretty bad. And I read the brief, and what I see offered up against it is that he'd like to be together with his family, and his wife thinks he's a good husband. As against this record, I don't know that amounts to very much. And there's, you know, under the old guideline regime, this is squarely within the guidelines. So what makes this sentence unreasonable? What would make it unreasonable, or at least questionable, is under the 3553A factors, the Court is to look at the seriousness of the offense and the nature and circumstances of the offense. On one hand. On the other hand, the Court is to look at the advisory guideline range. The Sentencing Commission, when they created the guidelines, went through a statistical analysis, a comparative analysis, and determined that for a given offense, in this case bank robbery, the guideline range should be X. And that is a pretty strong pronouncement as to the seriousness of the offense and the circumstances of the offense. In this case, that range turned out to be about 63 to 78 months. And this is based on the crime of conviction. But the career offender guideline, when the career offender guidelines are implicated, that range becomes essentially quadrupled into the 260, 270-month range. And our, the career offender context, a guideline range may indeed be presumptively unreasonable. And that would be our argument. And I'm going to leave the rest of my time for co-counsel. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Bo Sterling on behalf of Defendant Ivan Gonzalez-Corporan. Just an administrative note, is this time correct, or were we supposed to get more time? No. That's it, but they have shoehorned a couple of cases into one slot. So, try to be ---- I can do it that way. That just wasn't my understanding originally. At issue in Mr. Gonzalez' appeal is the sentencing. Our position is that the district court erred in giving a career offender enhancement. One or both of the underlying predicate felonies does not qualify as a crime of violence, and thus the sentence enhancement was incorrect. First I'll begin with the 1991 conviction, if I may. The 1991 conviction is not a crime of violence because the Puerto Rico statute, Article 173, is over-inclusive. In this case, it applies when there's the taking of property by violence or intimidation. And in Puerto Rico, the word intimidation has never been interpreted to necessarily mean intimidation based on an implied threat or attempt of physical force. All we got on that was a portion of the Puerto Rican Supreme Court decision, I guess in Quinones  That's all we have. We didn't have a translation of the entire case, just a section. But looking at that section as a whole, and looking at the language about intimidation and the context, the Court goes on to talk about common sense tells us that the Commission for Robbery, assailants ordinarily use firearms or lethal weapons to produce the intimidation. So it's expected that injuries will happen. And reading that excerpt as a whole, it seemed to indicate that the Puerto Rican Supreme Court was using intimidation with the thought that it would be intimidation with weapons. And so consistent with the federal robbery statute, it also uses the word intimidation. What other cases or what other interpretations have there been of intimidation that could help us better understand why your position is that that word means something different? Well, first of all, if I may, I'd like to address the context of that Quinones case. That was not a case where the Puerto Rico Supreme Court was specifically defining the required elements of robbery or Article 173. It arose in the context of the death penalty of the felony murder rule. And I believe the Court, if you read the case, is not talking about specific elements. It's talking about – I'm sorry, go ahead. Which we didn't have the whole case translated. We have what the government provided in by way of a translation. But from that section, we can see that the Court is talking about robbery in a generic sense or in an aggregate sense, that it can be a dangerous crime. But it's certainly not saying that that's the required element for any conviction under that statute. In terms of other – That's not unlike the federal robbery statute. I mean, that statute contains the word intimidation as well. It does. And it's also a common, common law configuration of language. The important distinction is that unlike in Puerto Rico where we just don't have much, there's a long history in the Ninth Circuit and in other circuits in the federal context of specifically defining the word intimidation as requiring a threat of force or violence. It's always a crime of violence in the federal system because it's been specifically defined that way as an element. Counsel, we have a – well, the Supreme Court has come down with a very recent case, this Duenas-Alvarez case. And in that case, Justice Breyer is saying kind of beyond a Taylor-Myers modified categorical analysis, that we've got to look at real life and go and look at the cases and see actually how the particular jurisdiction has applied the statute. And if they've always applied it in the context of violence, then we're going to say that it is a statute that qualifies. If you had the opportunity to go back and look at the cases, would that be helpful to you? Because Duenas-Alvarez is just brand new and we're all kind of taking a different look at the picture. Yes, Your Honor. I mean, in going through the frustrating aspect of this appeal is that we just don't know enough about what happens in Puerto Rico. We have the one decision. We don't have the long history the way we have in other cases. That gets to another point is, if I may move on slightly, but it ties into that, is that the district court really didn't have time to look at all of this because it didn't receive the documents from the government until the day of the hearing. But it did have the pre-sentence report, right, the PSR before it that have included the information about the prior convictions? It didn't have all of the attachments regarding the revocations of parole and the sentences themselves. I'm sure that the government will correct me if I'm wrong here, but the government did not have the supporting documentation with the pre-sentence report. I see that's the end of my time. We'll still give you a minute for rebuttal. Okay. Thank you, Your Honor. And may it please the Court, I'm Timothy Vasquez, and Assistant Attorney General for the District of Nevada. I'd like to begin where counsel left off talking about what the Court had before it and put this into proper perspective, because if you go back through the records and the excerpts of records, you'll find that sentence at one point was set for December 12th, 2005. On November 23rd, counsel for Gonzales-Corporan submitted objections to the probation office. The government responded to those, provided a copy to defense counsel on December 1st of 2005, well in advance of the scheduled hearing. At the request of defense counsel, that was continued until February 21st, 2006. There's no response, nothing further from defense counsel until less than a week, less than a week before the hearing. That's not even counting intervening holidays and weekends. On December – rather, on February 15th, they file their sentencing memorandum and request for downward adjustment. Now, in the reply, and again here orally, I'm taken to task for not filing a written response with the Court within that 3-day window that I had to do so. And quite frankly, I don't believe that's appropriate. They filed well in advance of the sentencing their objections with the probation office, I provided them with a copy, and probation, in turn, made adjustments to the PSR as they believed appropriate and advised the Court. And that's the context that we go before the district court on February 21st. On February 21st, the district court was provided with a copy of that response with all the attachments. Now, if counsel suggests this didn't give the district court enough time, I would remind counsel and also this Court that this wasn't the first time that Gonzales-Corporan was before that judge for sentencing. This had been remanded after the first visit to this Court. He was familiar with the facts of the case, familiar with the criminal history, and the response was filed with the district court on that day, although it didn't receive an exhibit number. With that introduction, then, let me talk about whether or not robbery is a crime of violence. The way we get to the Lucret-Quinonez decision, and I apologize if I should have translated the entire document. It was fairly lengthy, so I went for the part that was pertinent. In any case, the way we get there is because defense counsel cited the Puerto Rico statute for a proposition saying that robbery could be committed by some sort of intimidation that didn't involve violence. You look at the Puerto Rico statute, the translated version, and actually what he's quoting is not the statute, but he's quoting an annotation, a footnote to Lucret-Quinonez. When we go to Lucret-Quinonez, this is what we find. And although he's correct, they're not going out and saying these are specifically the elements of robbery one way or another. You put this in context of felony murder. They're trying to decide does robbery constitute a predicate for felony murder. And what do they conclude? They talk about either the violence or the intimidation. And then I'll read part of the translation. When either of these two situations are present, indispensable to the offense of robbery, it is to be expected that the victim is exposed to serious risk of danger of death or grave bodily harm. Therefore, it's reasonable to conclude that robbery is, as such, is a very dangerous crime for human life. That's very consistent with the common law interpretation of robbery and very inconsistent with this Court's interpretations of the Federal bank robbery statute as to what intimidation involves. And for those reasons, I submit to the Court that notwithstanding that Puerto Rico speaks Spanish, it's not altogether different. And the principles articulated in Lucret-Quinonez are right on point with the principles set forth in CELFA, and CELFA controls that issue. Robbery is a crime of violence. In support of the proposition, the Puerto Rican court cites to ALR and a number of California State decisions. Do you happen to know if Puerto Rico had a practice of turning to California or customarily builds its law on California law? Your Honor, I don't. Fairly a guess. I mean, I'm from Hawaii. Hawaii was a territory before it was a State, and there, in fact, were certain States that Hawaii built its law on. So I was curious if you knew anything about Puerto Rico's practice. Your Honor, one of the ironies of this case is I was an AUSA in Puerto Rico for three and a half, or make that four and a half years, before transferring to Nevada, and this is the case that greeted me when I arrived. I'm not licensed in Puerto Rico, but from practicing there, it's a commonwealth system – well, it's a commonwealth of the United States. It's not a State. And their criminal code comes from the civil code of Spain, not so much the common law. So it's not common for them to turn to common law principles for these definitions. The fact that they do so in this case, I think, is telling as to what they were trying to do, what they were saying. Robbery is robbery, whether it be in California, whether it be in Puerto Rico, wherever it may occur. But with that, then, let me move on, because I noted that Puerto Rico is somewhat different, being a civil law jurisdiction, and that's reflected most conspicuously in their charging documents. In Federal practice, we're used to multiple counts or multiple charges being contained in a single charging instrument. In Puerto Rico, it's somewhat different. Each charge, each alleged violation gets its own charging document and its own case number. And that's what's reflected when you look at Excerpt of Record 72, which is the translation of the sentence from the 1986 bank robbery conviction. And at the bottom of the page, well, Excerpt of Record 72, the judge is imposing a sentence for robbery of 12 years in prison consecutive to G86-667, 670, and concurrent to G86-676, 658, 664, 61, 655. The reason that this gets broken down that way, and you'll see that if you turn also to the Excerpt of Record 82, where there is another robbery charge related to the same event in a separate charging document. And that one, if you read the documents closely, pertains to, I believe, a watch that was taken as opposed to the money from the bank. But it gets parsed out in this way. By the time it gets to trial or sentence, it all gets put back on the same track. It all gets bundled together. And you see that here where the sentences get bundled together. Now, the important part of Excerpt of Record 72 that I'd like to emphasize is that when the judge imposed that 12-year prison term, his language was significant. He gives him credit for time served while in preventive custody and while waiting for his sentence, and he will continue in custody until the full term of his sentence is completed. This is in 1986. We reach our 15-year window on April 1, 1988. Can you tell us, if you know, I couldn't really figure it out from the record, what sentence he was serving and from what he was paroled. He has all these sentences. He does. And the parole system in Puerto Rico moves on a track slightly separate from the court system, so it gets its own case number. And counsel says, well, we don't know exactly what sentence he was serving and when he was serving it. But logically, let's approach this, because he gets a 12-year sentence to be served continuously from that point forward. He's paroled under the Puerto Rico system that's explained in the briefs. He's paroled on October 30, 1990. That's the effective date of the parole. Counsel suggests, well, up until 1990, he'd only been serving his earlier burglary-related sentence. He'd only been serving his consecutive sentences, in this case of three years. If that's the case, let's assume that's the case for a moment. Those sentences are fully discharged. So what's left to be paroled? Even if you go by their logic, and I'm not saying they're correct, what's left to be paroled is this bundle that includes the bank robbery. And he's paroled for that. And then he's revoked for that. And if you follow the case numbers, when he's paroled, the case number on that hearing was 28203. That was the matter number. When the parole was revoked, again, the same case number, 28203. It's clear that his parole is being revoked and his parole is being granted, whether in whole or in part, for that robbery conviction. If he served any of it earlier, it goes into the 1988 window. If he didn't serve any of it and was paroled, he goes back in jail and, again, we're within the 1988 window and we're within the 15-year time frame. With that, I briefly will touch upon Hector Serino's case. And I'll be brief because I think the district court judge, which I've quoted at length in my response, was very articulate and thoughtful in the resentencing. Not only did he say I would impose the same sentence again, he went on and articulated a litany of reasons as to why. And I believe that this is the epitome of a reasonable sentence. If the Court has any questions, I'd be happy to try to answer them. If not, I will just thank you for your time. I was going to give both defendants a minute, but the way the government's argument worked out, I suspect it would be fairest to let Mr. Sterling take both of the minutes. Mr. Carr, if you really have something you have to say, you can squeeze it in at the  I'll give you two minutes. Thank you, Your Honor. In response to Judge Fletcher's question, yes, we would very much like to have the opportunity to further pursue exactly what intimidation means in Puerto Rico if we have the opportunity of a remand. And along those lines, I think that's fair because the district court really didn't have an opportunity to meaningfully consider this issue in light of the production of the documents at the hearing, which we've objected to and are not actually a part of the record. And two, that the issue was never really argued by the government at the hearing in terms of what was the meaning of robbery and whether this was robbery. So, yes, we would like to have an opportunity to follow up on that further if we're given the chance to. But did have you to date found any cases where violence wasn't involved? In Puerto Rico or more generally, Your Honor? No, Puerto Rico. That's what this Supreme Court case would require. And no, we have not done that search, to be honest, Your Honor. I don't speak Spanish. We would have to. Mr. Valencia does speak Spanish. That might be something that he would be able to do. We certainly could find somebody to translate the necessary documents for us if we were given the opportunity to do that. If I may, I'd like to make one last point, and this regards the 1986 convictions that were just addressed by the government. What he was, Mr. Gonzales-Corporan, was in jail for and what he was being paroled for at those various paroles and revocations is pure speculation. None of that is on the record. There's nothing about good time credits. There's nothing in the record that shows that he even qualifies for good time credits based on his behavior while he was in prison. Purely speculative. I don't know what that argument about the number on the hearing document. That's a new argument. I'm not sure what he's referring to. But none of the parole documents have the conviction numbers, so it's impossible to trace what exactly he was serving for the various consecutive sentences. Well, I think it's pretty clear he couldn't have served out his robbery sentence at the point that he fully, at the time that he was released. Is that accurate? That is accurate. And you're talking about the 1991 release, I assume. No, that is accurate. He had two three-year consecutive sentences to be served before he even began his robbery sentence. And then he gets another conviction. So, you know, I don't know how things work in Puerto Rico. I don't think anybody can tell from this record. He has years and years and years of convictions, and then he's out in a matter of a couple of years. And we just don't know what happened. Maybe he was never served any time on the robbery. Certainly, they wouldn't have completely discharged that robbery sentence. He must have been paroled for that as part of what he was paroled for. Well, as reasonable people, we would like to assume that. But, frankly, Your Honor, we just don't know. We just don't know from the record. We can only speculate. And I think it's the government's job and burden to clearly show exactly what he was in for at what time and what he was paroled on in order to get the enhancement, much as we'd like to speculate as reasonable people. Unless there's anything else, Your Honor, then I see I've used up all my time. Thank you. Anything you need to tell us? No, Your Honor. Thank you. I appreciate the argument made by all counsel. The cases are submitted.
judges: B. Fletcher, Clifton, Ikuta